## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
|  | : | **CRIMINAL NO. 12-_____** |
| **UNITED STATES OF AMERICA** | : | **DATE FILED:  8-21-12** |
| **v.** | : | **VIOLATIONS** |
|  |  | **18 U.S.C. § 371 (conspiracy to defraud - one count)** |
| **SAMYAK VEERA and** | : | **26 U.S.C. § 7212(a) (corruptly** |
| **JOHN IVSAN** | : | **endeavoring to obstruct the IRS - one count)** |
|  | : | **26 U.S.C. § 7201 (tax evasion - 11 counts)** |
|  |  | **18 U.S.C. § 1343 (wire fraud - 19 counts)** |
|  | : |  |
|  |  | **Notice of Forfeiture** |
|  | : |  |
|  | : | <u>UNDER SEAL</u> |

## <u>I N D I C T M E N T</u>

## <u>COUNT ONE</u>

**THE GRAND JURY CHARGES THAT:**

At all times material to this indictment, unless otherwise specified:

## I.     INDIVIDUALS AND ENTITIES

1.      Defendant SAMYAK VEERA, then a resident of, among other places, New York, New York, Riviera Beach, Florida, and Boston, Massachusetts, operated and controlled various entities that engaged in fraudulent tax transactions, including Sequoia Capital, LLC ("Sequoia"), MidCoast Financial, Inc. ("MidCoast Financial"), Delta Trading Partners, LLC ("Delta Trading"), Aleph Capital, LLC ("Aleph"), and Stanford Acquisitions, LLC ("Stanford").

1

2.      Defendant JOHN IVSAN was an attorney working in Charlotte, North Carolina and a resident of Fort Mill, South Carolina.  He represented various entities operated and controlled by defendant SAMYAK VEERA, including Sequoia, MidCoast Financial, Delta Trading, Aleph, and Stanford.  He also developed a close business relationship with the Southpac Group, a purported international asset protection organization with member entities in the Cook Islands, Nevis, and Switzerland (collectively, "Southpac").  At some point in or about 2005, defendant IVSAN obtained an ownership interest in the Southpac Group or one of its affiliates.

3.      C.S., a co-conspirator not named as a defendant here, was the father of defendant SAMYAK VEERA.

4.      MidCoast Credit Corp. ("MidCoast Credit") was a corporation operating in Florida that identified other corporations for its acquisition.  The corporations that MidCoast Credit sought to buy either had recently sold their appreciated assets or had marketable securities that could be readily sold (the "target corporations").  MidCoast Credit owned and operated various subsidiaries, including MidCoast Investments, Inc., MDC Credit Corp., and Premium Acquisitions Corp., through which it purchased target corporations.

5.      MidCoast Financial was a Florida corporation formed in April 2004. MidCoast Financial purchased assets from MidCoast Credit in May 2004, took over its corporate acquisition business, hired its corporate acquisition employees, and operated in Lake Worth, Florida, through at least December 2005.  MidCoast Financial was owned by TSR Capital Corp., which in turn was owned by C.S.  C.S. also served as MidCoast Financial's President.  Despite not having a formal position at MidCoast Financial, defendant SAMYAK VEERA ran its day-to-day operations, which involved identifying, purchasing, and re-selling target corporations.

2

6.      Sequoia was a limited liability company formed in or about June 2003 on the Caribbean island of Nevis.  Defendant JOHN IVSAN opened an offshore account for Sequoia at Capital Security Bank Ltd. (or "CSB") in or about October 2003.  At different times, H.D.B., a co-conspirator not named as a defendant here, and a relative of defendant SAMYAK VEERA served as the President of Sequoia, functioning as the nominees for the defendants in the fraudulent tax transactions.

7.      Stanford was a limited liability company formed in Delaware in or about June 2003.  At different times, a relative or associate of defendant SAMYAK VEERA owned or controlled Stanford, and an offshore trust served as the Manager of Stanford, functioning as the nominees for the defendants in the fraudulent tax transactions.

8.      Delta Trading was a limited liability company formed in Nevis in or about July 2003.  Defendant JOHN IVSAN opened an offshore account for Delta Trading at CSB in or about October 2003.  A relative of defendant SAMYAK VEERA served as the President of Delta Trading, functioning as the nominee for the defendants in the fraudulent tax transactions.

9.      The Santalum Charitable Trust (or "Santalum") purported to be a charitable trust settled in Nevis in or about May 2005 by a relative of defendant SAMYAK VEERA.  This relative also served as Santalum's Protector, functioning as the nominee for the defendants in the fraudulent tax transactions.  An offshore account for Santalum was opened at CSB in or about July 2005.

10.      Amalfi Capital Partners, LLC ("Amalfi") was a limited liability company formed on or about September 2004 in the State of Delaware.  A.A., a co-conspirator not named as a defendant here, acted as the Manager of Amalfi, as the nominee of the defendants, for the

purpose of acting as a straw buyer of 11 target corporations (the "Amalfi target corporations") for the defendants.

11.    Icarus Capital Partners, LLC ("Icarus") was a limited liability company formed on or about March 2005 in the State of Delaware.  A.A. acted as the Manager of Icarus, as the nominee of the defendants, for the purpose of acting as a straw buyer of 22 target corporations (the "Icarus target corporations") for the defendants.

12.    A.A., a co-conspirator not named as a defendant here, was variously a resident of Columbia, Missouri, Philadelphia, Pennsylvania, and Jersey City, New Jersey.  He was also a close friend of defendant SAMYAK VEERA.  A.A. served as a nominee President for several target corporations after their purchase by Sequoia.  A.A. also served as Manager of Amalfi and Icarus, functioning as a nominee for defendant VEERA.  A.A. lived in Philadelphia, Pennsylvania from in or about May 2005 through in or about August 2008 to attend graduate school.

13.    H.D.B., a co-conspirator not named as a defendant here, was a resident of New Hyde Park, New York, and served as the bookkeeper for defendant SAMYAK VEERA and various entities that he operated and controlled.  In addition, she served as the President of Sequoia from in or about October 2003 through in or about December 2003, functioning as a nominee for defendant VEERA.  She also worked for both MidCoast Financial and A.A.

14.    Investissements de Rhinoceros de Menthe Verte, Inc. ("IRMV"), originally called Runvee Holdings, Inc., was a Delaware corporation.  The defendants caused Sequoia to purchase IRMV in Summer 2004, eliminated IRMV's corporate income taxes, and used its stock shares in the fraudulent tax transactions.

15.     Shadow's Reflections, Inc., was a corporation formed in Nevada in or about June 2004 and was owned by A.A. as a nominee for the defendants.

16.     Capital Security Bank Ltd. was a financial institution located in the Cook Islands, self-governing islands in the South Pacific.  CSB was owned by or affiliated with the Southpac member entity in the Cook Islands.

17.     European American Investment Bank AG ("Euram") was a financial institution located in Austria.  Euram had an affiliate entity located in London, England that also communicated directly with bank clients located in the United States.

## II.     THE FRAUDULENT TRANSACTIONS

18.     From at least in or about 2003 through at least in or about August 2007, defendants SAMYAK VEERA and JOHN IVSAN and others known and unknown to the Grand Jury (their "co-conspirators") participated in a fraudulent tax scheme to evade approximately $200 million in corporate income taxes, to claim millions of dollars of fraudulent corporate tax refunds, to hide from the Internal Revenue Service (the "IRS") the true nature of the transactions and the relationships among the conspirators and their entities, to enrich themselves, and to conceal their own and other conspirators' illegal profits.

19.     Defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators designed, marketed, implemented, and defended the transactions that were a part of this scheme using means and methods intended to deceive the IRS about the transactions; caused to be prepared and filed with the IRS false and fraudulent U.S. corporate income tax returns reporting fraudulent losses, resulting in the evasion of the income taxes of target corporations;

and fraudulently concealed from and misrepresented the true nature of the tax transactions to the IRS, in order to enrich themselves personally.

20.     Defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators designed a scheme that used fraudulent transactions as a means of evading the income taxes of target corporations by creating fraudulent losses to eliminate taxable gains incurred from selling appreciated corporate assets.  These corporate income taxes would have to be paid at or around the time that the corporations filed their federal corporate income tax returns, IRS Form 1120.  These taxes were never paid, however, because the defendants' scheme eliminated the corporations' tax liabilities.  Thus, the defendants and their conspirators paid none of the target corporations' anticipated tax liabilities, instead diverting the funds that would otherwise have been paid to the IRS to their personal benefit.

21.     Defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators implemented their fraudulent tax scheme through four basic steps:  (1) they caused entities such as MidCoast Financial to purchase target corporations that had recently incurred large gains; (2) they caused MidCoast Financial and the other entities to "sell" the target corporations to straw buyers controlled by defendants VEERA and IVSAN through nominees; (3) they then caused these straw buyers to evade the corporations' income taxes by wiping out their gains with fraudulent losses; and (4) the conspirators distributed the proceeds (basically, the unpaid taxes) through disguised means.

A.     **The Sequoia Transactions**

22.     From in or about late 2003 through in or about mid-2004, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused Sequoia, as their

nominee, to purchase the stock of 22 target corporations directly and indirectly from MidCoast Credit.  The defendants also caused Sequoia to purchase the stock of another target corporation from an entity called Stamford Development Corp.

23.    After Sequoia acquired these 23 target corporations (the "Sequoia target corporations"), defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused the target corporations to transfer all or most of their cash (which was their primary, if not only, asset) from their U.S. bank accounts to the offshore Delta Trading account at CSB, in order to claim that the target corporations were transferring the funds to the Delta Trading account to purchase derivative contracts.  The Delta Trading bank account, however, was controlled by defendants VEERA and IVSAN through a nominee, who was a family member of defendant VEERA.

24.    Defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused the 23 Sequoia target corporations to falsely claim on their federal corporate income tax returns, Forms 1120, that the corporations engaged in currency trades around the time of the fund transfers, in amounts totaling the amount of each target corporation's transfer to Delta Trading.  The tax returns claimed that each of the currency trades had expired and was worthless. Accordingly, the 23 Sequoia target corporations claimed on their tax returns that the corporations suffered large capital and ordinary losses.  The losses, however, were fraudulent, simply created by the defendants transferring funds from the 23 target corporations — owned by one nominee owned and controlled by defendant SAMYAK VEERA's family, Sequoia — to another nominee also controlled by his family, Delta Trading.  Moreover, most of the transferred funds did not remain in the Delta Trading account, but instead were immediately transferred to defendant

IVSAN's attorney trust account at his law firm and used by Sequoia to acquire other target corporations.

25.     As a result of claiming the false capital and ordinary losses, defendants SAMYAK and JOHN IVSAN and their co-conspirators caused the 23 Sequoia target corporations' tax returns to under-report the target corporations' taxable income and total tax. Collectively, defendants VEERA and IVSAN, along with their co-conspirators, caused the Sequoia target corporations collectively to evade over $35 million in corporate taxes using the fraudulent Delta Trading losses on the target corporations' tax returns for the years in which the target corporations were purchased.

26.     In addition, based on the fraudulent losses claimed on the false corporate tax returns, defendants SAMYAK VEERA and JOHN IVSAN, along with their co-conspirators, used false IRS Forms 1139, Corporate Application for Tentative Refund, to cause the Sequoia target corporations to apply for $550,000 in fraudulent refunds of taxes that the corporations had paid in prior years.

27.     Throughout the process of acquiring and draining the Sequoia target corporations, defendants SAMYAK VEERA and JOHN IVSAN often acted through various nominees, including A.A., H.D.B., and members of defendant VEERA's family, to conceal their role in the fraudulent scheme.

**B.      The IRMV Transaction**

28.     In mid-2004, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators used Sequoia and the 23 Sequoia target corporations to evade the corporate income taxes of IRMV, a target corporation that had recently sold real estate for a large capital

gain.  The defendants and their co-conspirators first caused Sequoia to acquire IRMV from

Tropicana Holdings LLC, an entity controlled by two co-conspirators not named as defendants

here, and then, for no legitimate business purpose, caused Sequoia contribute the 23 Sequoia

target corporations' stock to IRMV, fraudulently claiming a basis (or investment cost) in this

stock of approximately $112 million.

      29.     Defendants SAMYAK VEERA and JOHN IVSAN and their co-

conspirators then caused IRMV to sell the stock of the 23 target corporations for only $115,000

to a nominee called Shadow's Reflections, nominally owned by A.A.  This fraudulent stock sale

purported to generate a loss of approximately $112 million for IRMV, which the conspirators

caused IRMV to claim on its federal corporate income tax return, Form 1120, for the fiscal year

ending July 31, 2004, resulting in the evasion of over $35 million in taxes.

      30.     Finally, in or about late July 2004, the defendants and their co-conspirators

caused IRMV to transfer $864,000 to the Delta Trading account at CSB and to fraudulently claim

currency trading losses in this amount on IRMV's corporate income tax return for the fiscal year

ending July 31, 2005.

      **C.**      **The MidCoast Financial, Amalfi, and Icarus Transactions**

      31.     In Spring 2004, defendants SAMYAK VEERA and JOHN IVSAN, along

with C.S., formed MidCoast Financial.  They then caused it to acquire MidCoast Credit's

acquisition business and to hire MidCoast Credit's corporate acquisition staff and several other

employees.

      32.     MidCoast Financial functioned as an intermediary, or "midco," acquiring

and re-selling target corporations.  Throughout MidCoast Financial's existence, defendant

SAMYAK VEERA operated the company, and defendant JOHN IVSAN functioned as his primary attorney.  The defendants and their co-conspirators caused MidCoast Financial (through subsidiaries) to purchase the target corporations by paying a "premium price" that was based on the fair market value of the corporations plus a percentage of the corporate tax liabilities that the conspirators intended to evade.

        33.      Defendants SAMYAK VEERA and JOHN IVSAN and A.A. formed the straw buyers that purchased the target corporations from MidCoast Financial to eliminate their income taxes, as follows:

        a.      First, in or about September 2004, the defendants and A.A. formed Amalfi by causing Sequoia to contribute the 1000 shares of IRMV stock to Amalfi, for a 90% ownership interest in Amalfi, and causing Shadow's Reflections to contribute $10,000 to Amalfi, for a 10% ownership interest.  The defendants caused Amalfi to fraudulently claim that the IRMV stock still had a basis of approximately $112 million.  Next, the defendants attempted to conceal their control over Amalfi by causing Sequoia to sell its 90% interest in Amalfi to another nominee called the Vanderbilt Hall Trust (which A.A. also controlled on paper as trustee).

        b.      Second, in early 2005, defendants VEERA and IVSAN, A.A., and their co-conspirators formed Icarus.  Specifically, the defendants and their co-conspirators formed a nominee called the Sigma Charitable Trust ("Sigma"), which in turned formed Icarus and named A.A. as its Manager.

        34.      Starting in November 2004, defendants SAMYAK VEERA and JOHN IVSAN caused MidCoast Financial to sell target corporations to Amalfi and Icarus.   The defendants and their co-conspirators also used three other midcos — Stanford, Aleph, and TCA

Capital, LLC ("TCA") — to acquire target corporations and then re-sell them to Amalfi and Icarus.

35.     Shortly after the purchases of the target corporations, defendant SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused MidCoast Financial, Stanford, and Aleph to remove most of the cash from the target corporations' bank accounts in exchange for "demand notes" that purportedly entitled the corporations to demand that the cash be returned. These demand notes were shams because the defendants did not intend for them to be repaid, and never attempted to repay them.

36.     After the formation of Amalfi and Icarus, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused MidCoast Financial, Stanford, Aleph, and TCA to "sell" target corporations to Amalfi and Icarus for the purpose of evading the target corporations' corporate income taxes that would soon become due and owing to the IRS.  With respect to MidCoast Financial, Stanford, and Aleph, the defendants did this by causing Amalfi and Icarus to assume from the three midcos the sham demand notes that had been issued to the target corporations by the midcos or their subsidiaries.  By assuming these demand notes, Amalfi and Icarus purported to owe the target corporations the millions of dollars that MidCoast Financial and the other midcos had removed from the target corporations.

37.     The assumption of the demand notes was a sham because the defendants and A.A. did not intend to have Amalfi and Icarus repay, and did not cause them to attempt to repay, the large loan obligations to the target corporations assumed by Amalfi and Icarus. Instead, the issuance of demand notes was merely a way for the midcos to remove most of the target corporations' funds by a means that to be appeared non-taxable, and the assumption of the

demand notes was merely a way for Amalfi and Icarus to obtain ownership of the target corporations for little to no cash.

38.     After Amalfi and Icarus purchased the target corporations, defendants SAMYAK VEERA and JOHN IVSAN caused A.A. to evade the corporate income tax liabilities of the target corporations through the use of substantial fraudulent losses, as detailed below.

### (1)     The Fraudulent Amalfi Losses

39.     With respect to the 11 Amalfi target corporations, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators created fraudulent losses in several ways.

40.     The conspirators created fraudulent capital losses by causing Amalfi to transfer IRMV shares (with a claimed per-share basis of approximately $111,000) to each Amalfi target corporation.  The target corporations claimed this high basis in the IRMV shares.  The defendants and their co-conspirators caused Amalfi to transfer enough IRMV shares to each Amalfi target corporation so that when the shares were re-sold for far less than this basis, the target corporations could claim paper losses that eliminated their capital gains.  The claimed basis was inflated and fraudulent, however, because Amalfi did not transfer the IRMV shares to the Amalfi target corporations for any reason other than to generate tax losses.

41.     Next, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused the Amalfi target corporations to sell their IRMV shares, with an inflated-basis of approximately $111,000 per share, to the Stanford midco for only $100 per share.  As planned, these contrived sales generated huge paper capital losses for the Amalfi target corporations sufficient to eliminate their capital gains.  The sales of IRMV shares to Stanford were shams that lacked both economic substance and business purpose.

42.     Defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators also caused seven of the 11 Amalfi target corporations to make large funds transfers to the Delta Trading account at CSB from December 2004 through June 2005 purportedly to fund currency trading.  The conspirators later caused the target corporations to claim fraudulent ordinary losses on their tax returns in total amounts equal to these transfers.  As with the Sequoia transactions, the Delta Trading losses claimed by the Amalfi target corporations were fraudulent because no actual currency trades were purchased, and the target corporations' funds were simply transferred to an offshore account that the defendants controlled.

43.     In or about February 2005, defendant JOHN IVSAN prepared a false and fraudulent legal opinion letter regarding the basis that the Amalfi target corporations claimed in the IRMV shares.  The conspirators caused this false opinion letter to be prepared with the understanding and intent that it would be presented to the IRS in defense of the transactions, if and when Amalfi or any of the Amalfi target corporations were audited.

### (2)     The Fraudulent Icarus Losses

44.     With respect to the 22 Icarus target corporations, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators created fraudulent losses in another way — by generating a large inventory of currency trades in a loss position, contributing them to the Icarus target corporations while claiming an inflated basis, and closing them out for far less than the claimed basis.  As a result, the defendants caused the Icarus target corporations to report bogus capital and ordinary losses exceeding $232 million.  These currency trades were not legitimate investments, but pre-planned, non-arms-length transactions structured to yield untaxed

gain positions (or "gain legs") and loss positions (or "loss legs") that were claimed as losses for tax purposes.

45.     In order to effectuate the creation of the fraudulent losses, in or about early 2005, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators created several nominee entities, Sigma, Icarus, and Trust A, a nominee charitable trust that the defendants and their co-conspirators caused A.A. to form in Missouri.

46.     Defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused Icarus to open an account at Euram in Austria, funded Icarus with over $1 million, and caused Icarus to obtain a loan facility of $15 million (subsequently increased to $50 million) so that Icarus could make a series of large offsetting currency trades with Euram.  The conspirators then caused Icarus to use this loan facility to purchase a series of sets of large offsetting, i.e., equal and opposite, currency trades from Euram.  As structured by the defendants, these trades contained two separate positions that either rose or fell in value very quickly.  Within days, the conspirators caused Icarus to cash out the gain leg of the offsetting trades and used the proceeds to buy more sets offsetting currency trades from Euram.  Meanwhile, the conspirators retained the loss legs, creating an inventory of loss legs to use later to eliminate taxable gains.

47.     From the end of April 2005 through end of May 2005, the conspirators repeated the purchase of offsetting currency trades and the cashing out of the gain legs multiple times and thereby generated an inventory of loss legs with a cost basis of over $200 million. With each set of offsetting trades, the conspirators drew down the loan facility, which the conspirators repaid when they closed out the gain legs, thereby using the same loan facility again and again.  As part of their plan to generate this inventory of loss legs, the conspirators caused

14

Icarus to cash out the gain legs for a profit of over $250 million in cash.  These funds, however, merely repaid the loan facility, and the income from cashing out these gain legs was not reportable to the IRS because, as structured by the defendants and their conspirators, Sigma was a foreign entity.

48.     In or about early June 2005, after the inventory of over $200 million in loss positions had been generated, the conspirators caused Sigma, their foreign nominee, to contribute Icarus (now with a huge inventory of loss legs and no gain legs) to Trust A, their U.S. nominee.

49.     Next, between June and December 2005, the conspirators caused Icarus to contribute for no consideration these loss positions to the 22 Icarus target corporations, claiming that they retained their high basis (based upon their original cost).  This claimed basis was inflated and fraudulent, however, because Icarus did not transfer the loss positions to the Icarus target corporations for any reason other than to generate tax losses.  As with the Amalfi transactions, the defendants and their co-conspirators caused Icarus to transfer enough loss positions to the Icarus target corporations so that when the target corporations closed out these loss positions with Euram, the target corporations could claim paper losses on their tax returns that eliminated their capital and ordinary gains.

50.     Generally, shortly after the 22 Icarus target corporations received the inflated-basis loss positions, the conspirators caused the Icarus target corporations to close out, or sell, their loss positions to Euram for their minimal fair market value, creating enormous paper losses for each of the target corporations.  In each instance, the losses were sufficient to eliminate

the target corporations' capital and ordinary gains and, where possible, to claim fraudulent tax refunds.

51.     Finally, after importing the losses and eliminating the 22 Icarus target corporations' gains, the conspirators caused the target corporations to file tax returns claiming the fraudulent losses and amended tax returns for prior years claiming refunds.  As with the Amalfi transactions, the transactions involving the Icarus target corporations were designed to yield non-economic (or paper) losses that the target corporations could use to offset their taxable income and eliminate their income tax liabilities.

52.     From June 2005 through March 2006, defendant SAMYAK VEERA and his co-conspirators caused a law firm to prepare false and fraudulent legal opinion letters regarding the Icarus transactions by providing the firm with false and incomplete information. The conspirators caused these false opinion letters to be prepared with the understanding and intent that they would be presented to the IRS in defense of the transaction, if and when Icarus or any of the Icarus target corporations were audited.

### (3)   The Filing of Fraudulent Tax Returns and Concealment from the IRS

53.     After creating fraudulent losses for the Amalfi and Icarus target corporations, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused to be filed with the IRS false corporate income tax returns for the Amalfi and Icarus target corporations that claimed the substantial bogus losses, which eliminated the corporations' gains. As a result, the target corporations not only evaded their own large corporate income tax liabilities for the current year, but also claimed fraudulent refunds of corporate income taxes that

the target corporations had paid in prior years, many of which were deposited in bank accounts in Philadelphia, Pennsylvania.

54.     Throughout the fraudulent scheme and in furtherance of it, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators concealed the fact that A.A. was taking instructions from defendants VEERA and IVSAN, and instead falsely portrayed A.A., Amalfi, and Icarus as independent, arms-length purchasers of the target corporations in order to conceal the true nature of their scheme from the IRS and the sellers of the target corporations.

**(4)     Fraudulent Distribution of the Conspirators' Proceeds**

55.     After the conspirators created fictitious losses to wipe out the Amalfi and Icarus target corporations' gains, they caused A.A., as Manager of Amalfi and Icarus, to transfer the remaining cash in these corporations, i.e., the conspirators' proceeds, to offshore accounts controlled by the defendants through at least three methods, each designed to conceal from the IRS the true nature of the transfers.

56.     The first method that the conspirators used to conceal the proceeds that they were distributing was the Delta Trading losses discussed above in paragraph 42.  Not only did the fraudulent transfers to Delta Trading's offshore bank account enable the target corporations to claim fictitious ordinary losses, but the transfers also enabled the conspirators to remove most of the target corporations' remaining cash in a non-taxable manner — concealed as trading losses.

57.     The second method that the conspirators used to conceal the distribution of their proceeds was to disguise the transfer of over $13 million to a bank account in the name of Santalum, a purported charitable trust, as charitable contributions.

17

58.     Finally, the third method that the conspirators used to conceal to the receipt of approximately $5.3 million in proceeds was to dissolve Amalfi and Icarus target corporations, to transfer their remaining cash to their owners Amalfi and Icarus (subsequently reporting these distributions as gains), and then to eliminate these gains with additional fraudulent currency trades purchased from Euram, the same method that they used to eliminate the corporate gains.

59.     Through these three fraudulent methods, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators received over $25 million in fraud proceeds from the Amalfi and Icarus target corporations.

**D.     Concealment of the Conspirators' Profits and Assets**

60.     Defendants SAMYAK VEERA and JOHN IVSAN took various actions to conceal the income that defendant VEERA and their co-conspirators received as part of the fraudulent scheme.

61.     As explained here, the defendants and their co-conspirators used U.S. and foreign nominee entities to cause much of the proceeds of the fraudulent scheme to be transferred through multiple offshore bank accounts to prevent the IRS from tracking these funds.

62.     In or about January 2004, defendant SAMYAK VEERA assisted A.A. in hiding his assets from the IRS by advising him to transfer over $1 million to the Delta Trading account at CSB and to falsely claim that this transfer was for the purchase of legitimate foreign currency options that had expired and were worthless, when in fact the transfer was designed to transfer A.A.'s funds outside the jurisdiction of the United States and to conceal the true nature of the transfer from the IRS.

18

63.     From in or about 2004 through in or about 2007, defendant SAMYAK

VEERA caused A.A. to receive compensation for his participation in the fraudulent scheme

through sham loans from defendant VEERA's nominees, which were in fact income to A.A. and

which he failed to report properly on his income tax returns.

64.     Defendant SAMYAK VEERA caused H.D.B. to receive compensation for

her participation in the conspiracy in cash in order to hide this income from the IRS.

III.    THE FRAUDULENT SCHEME

A.      **Fraud in the Design of the Conspirators' Scheme**

65.     The conspirators' transactions were designed to produce fraudulent tax

losses for the target corporations and IRMV through a contrived, preplanned, and preordained

series of steps that lacked both economic substance and business purpose, and resulted in non-

economic losses from the transactions flowing to the target corporations and IRMV in order to

offset their taxable income and reduce their income tax liabilities.  There was no reasonable

possibility for the clients to make a profit, given the duration and structure of the transactions and

the fees required to be paid to obtain the losses.  The use of the entities in the Sequoia, IRMV,

Amalfi, and Icarus transactions — the midcos, their subsidiaries, the straw buyers, Delta Trading,

IRMV, and Santalum — was designed to achieve the desired tax loss in a manner that concealed

the true nature of the tax transactions from the IRS and the relationships among the various

parties to the transactions.

66.     In structuring the Sequoia transactions, defendants SAMYAK VEERA

and JOHN IVSAN and their co-conspirators opened an offshore Delta Trading account at CSB.

They then, over several months, caused the Sequoia target corporations to transfer approximately

19

$120 million to this bank account.  Finally, the defendants and their co-conspirators caused the 23 Sequoia target corporations to claim false and fraudulent trading losses on their tax returns in total amounts equal to the target corporations' transfers to the Delta Trading account.

67.    As the defendants and others well knew, the 23 Sequoia corporations did not engage in legitimate currency trades with Delta Trading, but rather transferred funds to an offshore bank account controlled by the defendants' nominee, a relative of defendant SAMYAK VEERA.  Most of the funds transferred to the Delta Trading account were quickly transferred back to Sequoia, which then transferred the funds to the attorney trust account at defendant JOHN IVSAN's law firm.  The defendants and their co-conspirators then used the funds to purchase more target corporations.

68.    The IRMV transaction was also designed to produce a tax loss for IRMV through a contrived, preplanned, and preordained series of steps that lacked economic substance and resulted in losses from the sale of stock of the 23 Sequoia target corporations to a nominee, Shadow's Reflections, in order to offset IRMV's taxable income.  There was no reasonable possibility of profit for Sequoia and IRMV in the IRMV transaction, given that the 23 Sequoia target corporations' stock was essentially worthless when Sequoia contributed this stock to IRMV and when IRMV sold the stock to Shadow's Reflections, which was controlled by A.A. as a nominee.  The use of the entities in the IRMV transaction — Tropicana Holdings, LLC, Sequoia, and Shadow's Reflections — was designed to achieve the desired tax loss in a manner that concealed from the IRS the true nature of the transaction and the parties' relationships to one another.

69.     In the Amalfi and Icarus transactions, the premium price that MidCoast
Financial paid for the target corporations' stock was based on the amount of corporate income
taxes that would be evaded.  The premium amount was generally a percentage of the tax liability.
Defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators hid the percentages
used in the premium price from the selling shareholders of the target corporations and their
representatives.

70.     Defendants SAMYAK VEERA and JOHN IVSAN and their co-
conspirators also designed the Amalfi transactions to produce tax losses for the Amalfi target
corporations through a contrived, preplanned, and preordained series of steps that lacked both
economic substance and business purpose, and resulted in non-economic losses from the
transactions flowing to the Amalfi target corporations in order to offset their taxable income and
eliminate their income tax liabilities.  There was no reasonable possibility for the Amalfi target
corporations to make a profit, given the duration and structure of the transactions.

71.     When the defendants caused Sequoia to contribute IRMV shares to
Amalfi, and then caused Amalfi to contribute enough of the IRMV shares to each Amalfi target
corporation to offset their capital gains, the defendants and their co-conspirators well knew that
none of those transactions was a legitimate, arms-length transaction.  Rather, they were
fraudulent transactions designed to achieve the desired tax loss in a manner that concealed the
true nature of the tax transactions from the IRS.

72.     Defendants SAMYAK VEERA and JOHN IVSAN and their co-
conspirators also caused some of the Amalfi target corporations to offset and eliminate the
corporations' ordinary gains by transferring funds to the Delta Trading account at CSB and

21

fraudulently claiming these transfers on their corporate tax return as trading losses.  As the defendants and others well knew, the Amalfi corporations did not engage in legitimate currency trades with Delta Trading, but rather transferred funds to an offshore bank account controlled by the defendants' nominee.

73.    As with the Amalfi transactions, the defendants and their co-conspirators designed the Icarus transactions to produce tax losses for the Icarus target corporations through a contrived, preplanned, and preordained series of steps that lacked both economic substance and business purpose, and resulted in non-economic losses from the transactions flowing to the Icarus target corporations in order to offset their taxable income and reduce their income tax liabilities. There was no reasonable possibility for the Icarus target corporations to make a profit, given the duration and structure of the transactions and the fees required to be paid to obtain the losses.

74.    In structuring the Icarus transactions, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators planned and pre-arranged a series of foreign currency transactions that would generate a large inventory of currency trades in loss positions so that the loss positions could be contributed to the Icarus target corporations in amounts sufficient to offset and eliminate their capital and ordinary gains and evade their corporate income tax liabilities.  As defendants and others well knew, the use of the nominee entities in the Icarus transactions — Icarus, Sigma, and Trust A — was designed to achieve the desired tax loss in a manner that concealed the true nature of the tax transactions from the IRS.

75.    Finally, the Amalfi and Icarus transactions were designed and implemented to conceal that these two straw buyers were controlled by the same people who were controlling MidCoast Financial and the other midcos — namely, defendants SAMYAK

VEERA and JOHN IVSAN.  Defendant VEERA solicited A.A. to serve as the Manager for

Amalfi and Icarus.  Nonetheless, the defendants formed these nominee entities with A.A. and

provided him with instructions and directions on specific actions to be taken in furtherance of the

conspiracy, despite the fact that defendant VEERA was operating MidCoast Financial and

defendant IVSAN was serving as its primary outside tax counsel.  All these actions by defendants

VEERA and IVSAN, A.A., and their co-conspirators served to conceal the fact that A.A., as

Manager of Amalfi and Icarus, was taking instructions and directions from defendants VEERA

and IVSAN and was not, in fact, an independent, arms-length purchaser of the target

corporations from MidCoast Financial and the other midcos.

### B.   Fraud in the Marketing of the Conspirators' Scheme

76.     In order to identify target corporations for purchase, MidCoast Financial

employed a staff of acquisition representatives who were responsible for locating potential target

corporations and providing them with an explanation of MidCoast Financial's acquisition

parameters and, if asked, its business model.  Defendants SAMYAK VEERA and JOHN IVSAN

and their co-conspirators, however, concealed MidCoast Financial's actual business model of

buying and immediately re-selling target corporations from its acquisition staff.  This

concealment necessarily caused the MidCoast Financial acquisition staff to describe MidCoast

Financial's business model inaccurately to potential selling shareholders of target corporations

and their representatives.  Throughout MidCoast Financial's operations, defendants VEERA and

IVSAN and their co-conspirators continued to conceal from the acquisition staff and the selling

shareholders what MidCoast Financial did with the target corporations after it purchased them.

23

C.      **Fraud in the Implementation of the Conspirators' Scheme**

        (1)      **The False and Fraudulent Opinion Letters**

77.      The law in effect at all times relevant to this Indictment provided that if a taxpayer claimed a tax benefit, and that benefit was later disallowed, the IRS could impose substantial penalties upon the taxpayer — ranging from 20% to 40% of the underpayment attributable to the tax benefit — unless the claimed tax benefit was supported by an independent opinion, reasonably relied upon by the taxpayer in good faith, that the client would "more likely than not" prevail in claiming the tax benefit if challenged by the IRS.  Defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators prepared and caused to be prepared a legal opinion letter regarding the Amalfi transactions that was based on false, misleading, and fraudulent statements and omitted material facts.  By preparing this false and fraudulent opinion letter, with the understanding and intent that it would be presented to the IRS in defense of the Amalfi transactions, if and when the Amalfi target corporations were audited, the defendants and their co-conspirators sought not only to undermine the ability of the IRS to ascertain the Amalfi target corporations' true tax liabilities, but also to undermine the IRS's ability to determine whether penalties should be imposed.

78.      In or about February 2005, defendant JOHN IVSAN, while effectively serving as MidCoast Financial's general counsel, prepared a legal opinion letter for his purported counter-party, A.A., as Manager of Amalfi.  The Amalfi opinion letter contained false and fraudulent statements, including the following:

a.      The opinion stated:

> Sequoia is a limited liability company organized under the laws of the Island of Nevis.  You have indicated that the ownership of Sequoia is unrelated to that of the current owners of Amalfi.

This statement was false and fraudulent because defendants SAMYAK VEERA and IVSAN controlled both Sequoia and Amalfi and used them as nominees.

b.      The opinion stated:  "Management and control of Amalfi is reserved exclusively to the Manager."  In truth and fact, the Manager of Amalfi, A.A., whose actions were controlled and directed by the defendants.  At no point did the nominee Manager of Amalfi act independently of defendants VEERA and IVSAN's directions.

c.      The opinion stated:  "Sequoia contributed all of the Targets other than IRMV to the capital of IRMV for substantial non-tax business reasons . . . ."  In truth and fact, Sequoia contributed all the Sequoia target corporations to IRMV for the sole purpose of eliminating IRMV's tax liability.  The transaction was a pre-planned part of the scheme, and the acts of Sequoia, IRMV, and the Sequoia target corporations were all controlled by defendants VEERA and IVSAN.

d.      The opinion stated:

> Sequoia joined as a Member of Amalfi for substantial non-tax business reasons, including its desire to partner with a business based in the United States in order to enhance IRMV's ability to collect on its note, which comprised a key asset of IRMV.

In truth and fact, there was no substantial non-tax business reason for Sequoia to join as a Member of Amalfi.  Rather, defendants VEERA and IVSAN caused Sequoia to become a Member of Amalfi in order to carry out their fraudulent tax scheme.  Defendants VEERA and

IVSAN controlled all of the entities involved in IRMV's note, its purported "key asset," and controlled whether IRMV could collect on this note.

> e.     The opinion stated:

> Sequoia has reviewed the description of the Transactions as set forth herein and such description, to its knowledge, is accurate and materially complete, and there are no pertinent facts relating to any aspect of the Transactions that have not been disclosed to me.

In truth and fact, defendants VEERA and IVSAN, as the individuals controlling Sequoia, knew that the information contained in this opinion letter was false and misleading.

> 79.     Defendant SAMYAK VEERA, A.A., and their co-conspirators also caused

a law firm to prepare pairs of legal opinion letters for each of the 22 Icarus target corporations. These opinion letters contain false and misleading factual representations regarding the Icarus transactions, including the following:

> a.     The Icarus opinion letters stated:

> Through his prior professional activities, [A.A.] had developed contact with the Southpac Trust Nevis Limited, a Nevis-based trust company ("Southpac") and Southpac became aware of [A.A.]'s experience with derivatives trading strategies. In early 2005, representatives of Southpac contacted [A.A.] about possible employment as a manager of a new entity that would be used to implement leveraged foreign currency trading transactions for a Nevis charitable trust for which Southpac served as a trustee. [A.A.] agreed to do so.

In truth and fact, defendants VEERA and JOHN IVSAN, not A.A., had contacts with Southpac, and the defendants, not representatives of Southpac, contacted A.A. to serve as their nominee with respect to Icarus. In addition, the opinion letters omitted that the primary purpose of the foreign currency trading transactions was not to earn a profit but instead to generate a large

inventory of currency trades in a loss position so that they could be used to create paper tax losses.

b.      The Icarus opinion letters stated:  "Acting on behalf of the Sigma Charitable Trust and in accordance with his agreed-upon engagement as manager of Icarus, [A.A.] executed formation documents for Icarus."  In truth and fact, A.A. formed Icarus for VEERA and his other co-conspirators, not for Sigma.

c.      The Icarus opinion letters stated:  "The purpose of [Trust A] is to alleviate poverty and provide humanitarian relief by making contributions to and raising funds for other nonprofit entities identified by [A.A.] . . . ."  In truth and fact, the purpose of Trust A was to facilitate the conspirators' fraudulent tax scheme.

d.      The Icarus opinion letters stated that "there was never any agreements or pre-existing understandings that [Trust A] would eventually become a beneficiary of the Sigma Charitable Trust."  This statement was false and fraudulent because the Icarus transactions, including the contribution of the loss positions (in Icarus) from Sigma to Trust A, were pre-arranged by the conspirators.

e.      Regarding the Icarus trading, the Icarus opinion letters stated:

> At various times, the gain side of each trade was closed and the proceeds were used to pay off the current draw-down on the loan facility.  The other side was kept open.  This kept open possible change in market direction and possible recovery of some portion of the loss positions and also involved economic risk to the extent of the value of these loss positions at that time (which was minimal).

This statement was also false and fraudulent because it omitted the fact that the purpose of the Icarus currency transactions was to generate a large inventory of currency trades in a loss

position.  The conspirators were not concerned about the possible change in market direction or the minimal economic risk.

80.     The Amalfi and the Icarus opinion letters failed to disclose that while defendant SAMYAK VEERA was operating MidCoast Financial, he was directing the actions of A.A., as Manager of Amalfi and Icarus.  In addition, the Amalfi opinion letter failed to disclose that defendant JOHN IVSAN, the author, was simultaneously representing both MidCoast Financial and Amalfi, and that defendant VEERA was providing instructions and directions to A.A.

### (2)     The Creation and Use of False and Fraudulent Documents

81.     In order to conceal that the transfers to Delta Trading were fraudulent, and to minimize the likelihood that the IRS would learn that these transfers were actually designed to create tax losses for the Sequoia and Amalfi target corporations, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators prepared and signed fraudulent trading documentation.  As anticipated, A.A. provided some of this fraudulent documentation to the IRS during the examinations of Amalfi target corporations to justify the Delta Trading losses claimed on the corporations' tax returns.

### (3)     False and Fraudulent Income Tax Returns

82.     Defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused to be prepared, signed, and filed with the IRS false and fraudulent income tax returns and forms, including IRS Forms 1120, 1139, and 4466.  These false and fraudulent returns reflected the tax benefits of the conspirators' fraudulent tax transactions.  Defendants VEERA and IVSAN caused their co-conspirators to gather the information necessary for these

returns, to prepare financial statements for the entities involved, and to prepare the false and fraudulent returns.  In some cases, A.A. signed the tax returns and caused them to be filed.  In other instances, other co-conspirators signed the returns and caused them to be filed.

### (4)   Attempts To Conceal Defendant SAMYAK VEERA's Role

83.   Throughout the implementation of the fraudulent scheme, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators engaged in the following tactics to conceal defendant VEERA's role as a leader of the scheme, including:

  a. although defendant VEERA directed MidCoast Financial's day-to-day operations, he caused C.S. to own MidCoast Financial and sign its transactional documents and caused C.S. and others to serve as its officers;

  b. while defendant VEERA took an active role in the management of MidCoast Financial, he refrained from participating in meetings and telephone conferences with outside parties;

  c. defendant IVSAN omitted any mention of defendant VEERA in his legal opinion letter for Amalfi, despite the fact that defendants VEERA and IVSAN were the architects of the Amalfi transactions;

  d. defendant VEERA and A.A. concealed from the law firm preparing the Icarus opinion letters that defendant VEERA was both running MidCoast Financial and directing A.A.'s actions; and

e.    defendant VEERA refrained from obtaining a MidCoast Financial

email address and used email accounts that prevented the recipient

from downloading the content of each message.

**D.    Fraud During IRS Audits**

84.    Beginning in Summer 2005, the IRS began an examination, or audit, of

MidCoast Financial.  Subsequently, the IRS initiated examinations of Amalfi, Icarus, their target

corporations, and A.A.  In connection with these examinations, the IRS sought information,

documents, and testimony from entities and individuals regarding the transactions.  In order to

mislead the IRS about the true nature of their fraudulent transactions, the defendants and their co-

conspirators provided and caused to be provided false information to the IRS during the

examinations, including false and misleading correspondence and false sworn testimony.  This

included false testimony by A.A. at the instruction of defendant SAMYAK VEERA in August

2007.

**E.    Tax Harm Caused by the Fraudulent Transactions**

85.    Because the conspirators' fraudulent tax transactions were executed

simply to generate huge tax losses (and lacked economic substance and business purpose), the

transactions resulted in massive tax evasion by the defendants.

86.    The Sequoia transactions resulted in the evasion of approximately $35

million in corporate income taxes and the receipt of approximately $550,000 in fraudulent

refunds.

87.    The IRMV transactions resulted in the evasion of approximately $35

million in corporate income taxes.

88.     The Amalfi transactions resulted in the evasion of approximately $36 million in corporate income taxes and the receipt of approximately $1,700,000 in fraudulent refunds.

89.     The Icarus transactions resulted in the evasion of approximately $72 million in corporate income taxes and the receipt of approximately $2,500,000 in fraudulent refunds.

## IV.   STATUTORY ALLEGATION

90.     From in or about June 2003 through at least in or about 2007, in the Eastern District of Pennsylvania and elsewhere, defendants

**SAMYAK VEERA and
JOHN IVSAN**

unlawfully, voluntarily, intentionally, and knowingly combined, conspired, confederated, and agreed together, and with others known and unknown to the Grand Jury, to defraud the United States and an agency thereof, that is, the Internal Revenue Service of the Treasury Department, and to commit offenses against the United States, that is, violations of Title 18, United States Code, Section 1343.

## V.   OBJECTS OF THE CONSPIRACY

91.     It was an object of the conspiracy that from in or about June 2003 through in or about 2007, defendants SAMYAK VEERA and JOHN IVSAN, and others both known and unknown to the Grand Jury, unlawfully, voluntarily, intentionally, and knowingly defrauded the United States of America and an agency thereof, that is, the IRS, by impeding, impairing,

defeating, and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes.

92.    It was an object of the conspiracy that from in or about June 2003 through in or about 2007, defendants SAMYAK VEERA and JOHN IVSAN, and others both known and unknown to the Grand Jury, unlawfully, willfully, and knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, that is, a scheme to defraud the IRS through the design, marketing, and implementation of the fraudulent tax transactions, and for the purpose of executing such scheme and artifice and attempting so to do, transmitted and caused to be transmitted by means of wire and radio communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, that is, wire transfers, telephone calls, faxes, and e-mails related to the design, marketing, implementation, and defense of the fraudulent tax transactions, in violation of Title 18, United States Code, Section 1343.

## VI.    MANNER AND MEANS OF THE CONSPIRACY

Among the manner and means by which defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators carried out the objectives of the conspiracy were the following:

93.    They designed, marketed, implemented, and defended the fraudulent tax transactions so that they could evade hundreds of millions of dollars in corporate taxes and obtain hundreds of thousands of dollars of fraudulent tax refunds, in order to personally enrich themselves.

94.     They designed, marketed, implemented, and defended the fraudulent tax transactions in ways that disguised the fact that the fraudulent transactions were pre-planned and tax-motivated, and lacked a non-tax business purpose.

95.     They designed, marketed, implemented, and defended the fraudulent tax transactions in ways that concealed their control over various entities and individuals that were purportedly engaging in arms-length transactions.

96.     They designed, marketed, implemented, and defended the tax shelter transactions in ways that made it difficult for the IRS to detect and determine the true nature of the transactions.

97.     They sought to prevent the IRS from learning that they had utilized fraudulent tax transactions consisting of preplanned steps that led to predetermined tax benefits.

98.     They caused to be prepared false and fraudulent documents in order to deceive the IRS, including but not limited to demand notes, legal opinion letters, and transactional documents.

99.     They caused to be prepared tax returns for the target corporations and other entities that were false and fraudulent because, among other things, they claimed fraudulent tax losses and thereby substantially understated the tax due and owing by the target corporations and the other entities.

100.     They caused to be prepared fraudulent tax refund applications for the target corporations that were false and fraudulent because, among other things, they claimed fraudulent tax losses for the target corporations and thereby allowed the target corporations to make false claims for refunds of millions of dollars of corporate taxes paid in prior years.

33

101.     They utilized offshore bank accounts to put the funds obtained in their fraudulent tax shelter scheme out of the jurisdiction of the United States and thus out of the reach of U.S. tax and law enforcement authorities.

102.     They compensated their co-conspirators with cash payments and payments disguised as loans as a way of rewarding those who assisted them with the execution of their tax shelter transactions.

103.     They provided and caused to be provided false information to the IRS during the course of audits, and made and caused to be made false statements to the IRS.

## VII.    OVERT ACTS

In furtherance of the conspiracy and in order to effect and accomplish its objectives within the Eastern District of Pennsylvania and elsewhere, at least one of the co-conspirators committed at least one overt act, including, among others, the following:

### A.    The Sequoia and IRMV Transactions

104.     On or about June 18, 2003, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused Sequoia to be formed in Nevis.

105.     On or about July 29, 2003, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused Delta Trading to be formed in Nevis.

106.     On or about September 19, 2003, defendant JOHN IVSAN established a forwarding address for Sequoia in Hamilton, Bermuda.

107.     In or about October 2003, defendant JOHN IVSAN assisted a relative of and nominee for defendant SAMYAK VEERA in opening bank account in the name of Delta

34

Trading and Sequoia at CSB and caused the bank statements for these accounts to be sent to defendant IVSAN.

108.    In or about November 2003, defendant JOHN IVSAN made multiple false statements to CSB and its affiliate Southpac regarding Delta Trading.

109.    From in or about November 2003 through in or about June 2004, defendants SAMYAK VEERA and JOHN IVSAN, with the assistance of co-conspirators A.A. and H.D.B., caused Sequoia to purchase 22 target corporations directly or indirectly from MidCoast Credit and one other target corporation from another midco called Stamford Development Corp.

110.    On or about November 30, 2003, defendants SAMYAK VEERA and JOHN IVSAN caused A.A., who was serving as their nominee President of two Sequoia target corporations, to request that Deutsche Bank transfer $2,460,000 and $2,960,000 from the two target corporations' respective U.S. bank accounts to the Delta Trading account at CSB.

111.    On or about the following dates, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused the following 23 Sequoia target corporations to wire transfer the following funds from their U.S. bank accounts to the Delta Trading account at CSB:

|   | Transfer Date | Target Corporation | Wire Amount |
|---|---|---|---|
| a | 11/17/03 | Sequoia TC1 | $3,990,000 |
| b | 11/17/03 | Sequoia TC2 | $31,430,000 |
| c | 12/2/03 | Sequoia TC3 | $2,460,000 |
| d | 12/2/03 | Sequoia TC4 | $2,960,000 |
| e | 12/4/03 | Sequoia TC5 | $4,730,000 |

| | Transfer Date | Target Corporation | Wire Amount |
|---|---|---|---|
| f | 12/4/03 | Sequoia TC6 | $630,000 |
| g | 12/10/03 | Sequoia TC7 | $16,780,000 |
| h | 12/18/03 | Sequoia TC8 | $870,000 |
| i | 12/18/03 | Sequoia TC9 | $995,000 |
| j | 12/18/03 | Sequoia TC10 | $3,080,000 |
| k | 12/18/03 | Sequoia TC11 | $2,875,000 |
| l | 12/18/03 | Sequoia TC12 | $1,250,000 |
| m | 12/18/03 | Sequoia TC13 | $1,985,000 |
| n | 12/19/03 | Sequoia TC14 | $2,780,000 |
| o | 12/22/03 | Sequoia TC15 | $505,000 |
| p | 12/23/03 | Sequoia TC16 | $1,090,000 |
| q | 3/24/04 | Sequoia TC17 | $3,990,000 |
| r | 4/26/04 | Sequoia TC18 | $10,110,000 |
| s | 6/2/04 | Sequoia TC19 | $3,835,000 |
| t | 6/3/04 | Sequoia TC20 | $5,921,642 |
| u | 6/3/04 | Sequoia TC21 | $8,556,843 |
| v | 6/3/04 | Sequoia TC22 | $5,345,845 |
| w | 12/18/04 | Sequoia TC23 | $3,115,000 |

112.    On or about the following dates, defendants SAMYAK VEERA and

JOHN IVSAN and their co-conspirators caused the following Sequoia target corporations to file

fraudulent federal corporate income tax returns, Forms 1120, for the following tax years, falsely

claiming fraudulent currency losses.

36

|   | Approximate Filing Date | Target Corporation | Tax Year Ended | Approximate Amount of Fraudulent Losses Reported |
|---|---|---|---|---|
| a | 7/23/04 | Sequoia TC8 | 12/31/03 | $870,000 |
| b | 7/23/04 | Sequoia TC9 | 12/31/03 | $995,000 |
| c | 7/23/04 | Sequoia TC10 | 12/31/03 | $3,080,000 |
| d | 7/23/04 | Sequoia TC16 | 2/29/04 | $1,090,000 |
| e | 7/23/04 | Sequoia TC1 | 12/31/03 | $3,990,000 |
| f | 7/23/04 | Sequoia TC12 | 12/31/03 | $1,250,000 |
| g | 7/23/04 | Sequoia TC13 | 1/31/04 | $1,985,000 |
| h | 7/26/04 | Sequoia TC7 | 12/31/03 | $16,780,000 |
| i | 7/26/04 | Sequoia TC11 | 12/31/03 | $2,875,000 |
| j | 7/26/04 | Sequoia TC3 | 12/31/03 | $2,460,000 |
| k | 7/26/04 | Sequoia TC15 | 12/31/03 | $505,000 |
| l | 7/26/04 | Sequoia TC23 | 12/31/03 | $3,115,000 |
| m | 7/26/04 | Sequoia TC4 | 12/31/03 | $2,960,000 |
| n | 7/26/04 | Sequoia TC6 | 12/31/03 | $630,000 |
| o | 7/27/04 | Sequoia TC14 | 12/31/03 | $2,780,000 |
| p | 8/24/04 | Sequoia TC5 | 12/31/03 | $4,730,000 |
| q | 9/22/04 | Sequoia TC2 | 12/31/03 | $31,430,000 |
| r | 12/21/04 | Sequoia TC17 | 3/31/04 | $3,990,000 |
| s | 5/20/05 | Sequoia TC19 | 8/31/04 | $3,850,000 |
| t | 7/20/05 | Sequoia TC21 | 10/31/04 | $8,556,843 |
| u | 7/20/05 | Sequoia TC22 | 10/31/04 | $5,345,845 |
| v | 7/23/05 | Sequoia TC18 | 4/30/04 | $10,110,000 |
| w | 9/19/05 | Sequoia TC20 | 12/31/04 | $5,921,642 |

113.    On or about June 24, 2004, defendants SAMYAK VEERA and JOHN IVSAN caused A.A. to form nominee corporation Shadow's Reflections.

114.    On or about June 30, 2004, defendants SAMYAK VEERA and JOHN IVSAN caused Sequoia to purchase the shares of IRMV from Tropicana Holdings, LLC by forgiving a $1.5 million note.

115.    On or about July 7, 2004, defendants SAMYAK VEERA and JOHN IVSAN caused Sequoia to contribute the shares of the 23 Sequoia target corporations to IRMV, claiming a basis of $111,798,244 in the shares.

116.    On or about July 22, 2004, defendants SAMYAK VEERA and JOHN IVSAN caused IRMV to transfer $864,000 to the Delta Trading account at CSB.

117.    On or about July 27, 2004, defendants SAMYAK VEERA and JOHN IVSAN, along with A.A., caused IRMV to sell the shares of the 23 Sequoia target corporations to Shadow's Reflections for $115,000 total.

118.    On or about April 21, 2005, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused IRMV to file a false federal corporate income tax return, Form 1120, for the fiscal year ending July 31, 2004.  This tax return falsely claimed that IRMV had a short-term capital loss of $112,796,683, which complete offset a capital gain of $111,120,173, resulting in IRMV reporting a taxable income of negative $653,385.

119.    On or about April 15, 2006, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused IRMV to file a false federal corporate income tax return, Form 1120, for the fiscal year ending July 31, 2005, which falsely claimed that IRMV had suffered a loss of $864,000 from the purchase of foreign currency options that expired worthless.

**B.     The MidCoast Financial, Amalfi, and Icarus Transactions**

120.    On or about April 30, 2004, defendants SAMYAK VEERA and JOHN IVSAN, along with C.S., formed MidCoast Financial in Florida.

121.    On or about May 19, 2004, defendants SAMYAK VEERA and JOHN IVSAN, along with C.S., caused MidCoast Financial to purchase certain assets from MidCoast Credit, to take over its corporate acquisitions business, and to hire MidCoast Credit's acquisition staff.

**(1)     The Amalfi Transactions**

122.    On or about September 1, 2004, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused Sequoia and Shadow's Reflections to form Amalfi.

123.    On or about October 12, 2004, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused Sequoia to transfer its ownership interest in Amalfi to the Vanderbilt Hall Trust.

124.    On or about December 1, 2004, defendant JOHN IVSAN sent an email to A.A. with information regarding Amalfi's basis in the 1000 shares of IRMV received from Sequoia.

125.    In or about February 2005, defendant JOHN IVSAN prepared and sent to A.A. a false, misleading, and incomplete legal opinion letter regarding the Amalfi transactions.

126.    In or about February 2005, defendant JOHN IVSAN sent A.A. false and misleading representation letters regarding the transactions involving Amalfi in connection with the legal opinion letter that he was preparing for Amalfi.

39

127.    In or about February 2005, defendant SAMYAK VEERA instructed A.A. to retain the Amalfi legal opinion letter in his files.

128.    On or about March 9, 2005, A.A. caused Amalfi to pay $100,000 to defendant JOHN IVSAN for this fraudulent legal opinion letter.

129.    From in or about October 2004 through in or about June 2005, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused MidCoast Financial and the Stanford midco to purchase the stock of the Amalfi target corporations for the premium prices.

130.    On or about the following dates, defendant SAMYAK VEERA and his co-conspirators caused the following Amalfi target corporations to transfer the following amounts to MidCoast Financial and caused the MidCoast Financial subsidiary that owned each target corporation to issue a sham demand note in the same amount to the target corporation:

|   | Date of Transfer and Demand Note | Target Corporation | Transfer and Demand Note Amount |
|---|---|---|---|
| a | 10/14/04 | Amalfi TC1 | $26,089,687 |
| b | 11/22/04 | Amalfi TC2 | $7,600,000 |
| c | 4/11/05 | Amalfi TC3 | $24,857,144 |
| d | 5/17/05 | Amalfi TC4 | $750,000 |
| e | 5/17/05 | Amalfi TC5 | $3,800,000 |
| f | 5/18/05 | Amalfi TC6 | $2,700,000 |
| g | 5/25/05 | Amalfi TC7 | $3,000,000 |
| h | 5/26/05 | Amalfi TC8 | $6,100,000 |

131.    On or about the following dates, defendants SAMYAK VEERA and

JOHN IVSAN, along with A.A., caused Amalfi to purchase the stock of the following target

corporations from MidCoast Financial's subsidiaries by having Amalfi assume the sham demand

notes in the following amounts:

|   | Date of Assumption | Target Corporation | Assumed Amount |
|---|---|---|---|
| a | 12/2/04 | Amalfi TC2 | $7,600,000 |
| b | 2/15/05 | Amalfi TC1 | $22,576,672 |
| c | 6/15/05 | Amalfi TC3 | $24,857,144 |
| d | 6/15/05 | Amalfi TC4 | $750,000 |
| e | 6/15/05 | Amalfi TC5 | $3,800,000 |
| f | 6/15/05 | Amalfi TC6 | $2,700,000 |
| g | 6/15/05 | Amalfi TC7 | $3,000,000 |
| h | 6/15/05 | Amalfi TC8 | $6,100,000 |

132.    On or about the following dates, defendants SAMYAK VEERA and

JOHN IVSAN, along with A.A., caused Amalfi to contribute the following of IRMV shares, with

the claimed basis set forth below, to the following Amalfi target corporations:

|   | Transfer Date | Target Corporation | Approximate Number of IRMV Shares | Claimed Basis |
|---|---|---|---|---|
| a | 12/23/04 | Amalfi TC2 | 73 | $8,161,272 |
| b | 12/23/04 | Amalfi TC9 | 6 | $670,789 |
| c | 3/22/05 | Amalfi TC1 | 104 | $11,627,017 |
| d | 6/16/05 | Amalfi TC3 | 163 | $18,223,113 |
| e | 6/16/05 | Amalfi TC4 | 7 | $782,588 |
| f | 6/16/05 | Amalfi TC5 | 33 | $3,689,342 |

| | Transfer Date | Target Corporation | Approximate Number of IRMV Shares | Claimed Basis |
|---|---|---|---|---|
| g | 6/16/05 | Amalfi TC6 | 28 | $3,130,351 |
| h | 6/16/05 | Amalfi TC7 | 26 | $2,906,754 |
| i | 6/16/05 | Amalfi TC8 | 36 | $4,024,737 |
| j | 6/16/05 | Amalfi TC10 | 67 | $7,490,482 |
| k | 6/16/05 | Amalfi TC11 | 364 | $40,694,559 |

133.    On or about the following dates, defendants SAMYAK VEERA and

JOHN IVSAN, along with A.A., caused the following Amalfi target corporations to sell their

IRMV shares to Stanford for the following amounts to generate the following fraudulent losses:

| | Transfer Date | Target Corporation | IRMV Share Sale Amount | Fraudulent Loss Generated |
|---|---|---|---|---|
| a | 12/29/04 | Amalfi TC2 | $7,300 | $8,153,972 |
| b | 12/29/04 | Amalfi TC9 | $600 | $670,189 |
| c | 6/28/05 | Amalfi TC1 | $10,400 | $11,616,617 |
| d | 6/28/05 | Amalfi TC3 | $16,300 | $18,206,813 |
| e | 6/28/05 | Amalfi TC4 | $700 | $781,888 |
| f | 6/28/05 | Amalfi TC5 | $3,300 | $3,686,042 |
| g | 6/28/05 | Amalfi TC6 | $2,800 | $3,127,551 |
| h | 6/28/05 | Amalfi TC7 | $2,600 | $2,904,154 |
| i | 6/28/05 | Amalfi TC8 | $3.600 | $4,021,137 |
| j | 6/28/05 | Amalfi TC10 | $6,700 | $7,483,782 |
| k | 6/28/05 | Amalfi TC11 | $36,400 | $40,658,159 |

134.    On or about the following dates, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused the following Amalfi target corporations to transfer the following funds from their U.S. bank accounts to the offshore Delta Trading account at CSB in order to generate fraudulent currency trading losses:

|   | Transfer Date | Target Corporation | Wire Amount |
|---|---|---|---|
| a | 12/7/04 | Amalfi TC2 | $2,925,500 |
| b | 12/21/04 | Amalfi TC9 | $600,000 |
| c | 3/8/05 | Amalfi TC1 | $4,100,000 |
| d | 6/20/05 | Amalfi TC7 | $445,000 |
| e | 6/21/05 | Amalfi TC3 | $645,000 |
| f | 6/21/05 | Amalfi TC8 | $1,340,00 |
| g | 6/21/05 | Amalfi TC11 | $745,000 |

135.    On or about June 22, 2005, defendant JOHN IVSAN made a false and misleading statement to CSB and Southpac about the funds transferred by the Amalfi target corporations to the Delta Trading account.

136.    On or about the following dates, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused the following Amalfi target corporations to file fraudulent federal corporate income tax returns, Forms 1120, for the following tax years, falsely claiming fraudulent losses in the following amounts.

|   | Approximate Filing Date | Target Corporation | Tax Year Ended | Approximate Total Amount of Fraudulent Losses Reported |
|---|---|---|---|---|
| a | 3/27/05 | Amalfi TC2 | 12/31/04 | $11,079,472 |
| b | 3/27/05 | Amalfi TC9 | 12/31/04 | $1,270,189 |
| c | 1/25/06 | Amalfi TC7 | 6/30/05 | $3,349,154 |
| d | 1/25/06 | Amalfi TC1 | 6/30/05 | $15,716,617 |
| e | 5/22/06 | Amalfi TC4 | 8/31/05 | $781,888 |
| f | 6/22/06 | Amalfi TC6 | 9/30/05 | $3,127,551 |
| g | 6/22/06 | Amalfi TC5 | 9/30/05 | $3,686,042 |
| h | 9/20/06 | Amalfi TC11 | 12/31/05 | $41,403,159 |
| i | 9/21/06 | Amalfi TC3 | 12/31/05 | $18,851,813 |
| j | 9/25/06 | Amalfi TC8 | 12/31/05 | $5,361,137 |
| k | 10/26/06 | Amalfi TC10 | 12/31/05 | $7,483,782 |

**(2)    The Icarus Transactions**

137.    On or about February 25, 2005, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators formed and caused to be formed Sigma in Nevis.

138.    On or about March 21, 2005, defendants SAMYAK VEERA and JOHN IVSAN, A.A., and their co-conspirators formed and caused to be formed Icarus, appointing A.A. as its Manager.

139.    On or about April 5, 2005, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused A.A. to open an account in the name of Icarus at Euram.

140.    On or about April 19, 2005, defendants SAMYAK VEERA and JOHN IVSAN caused A.A. to form Trust A to function as a nominee.

44

141.    From on or about April 21, 2005 through on or about May 27, 2005, defendant SAMYAK VEERA, A.A., and their co-conspirators caused Icarus to engage in currency trades with Euram to generate a large inventory of currency trades in a loss position.

142.    On or about June 3, 2005, defendant SAMYAK VEERA and A.A. caused Sigma to contribute Icarus (with its large inventory of currency trades in a loss position) to Trust A.

143.    From in or about June 2005 through in or about November 2005, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused MidCoast Financial and two other midcos to purchase the stock of the Icarus target corporations for the premium prices.

144.    On or about the following dates, defendant SAMYAK VEERA and his co-conspirators caused the following Icarus target corporations to transfer the following amounts to MidCoast Financial and caused the MidCoast Financial subsidiary that owned each target corporation to issue a sham demand note in the same amount to the target corporation:

|   | Dates of Transfer and Demand Note | Target Corporation | Transfer and Demand Note Amount |
|---|---|---|---|
| a | 3/31/05 | Icarus TC1 | $26,000,000 |
| b | 4/6/05 and 5/4/05 | Icarus TC2 | $2,150,000 |
| c | 5/19/05 and 5/26/05 | Icarus TC3 | $37,850,000 |
| d | 6/24/05 | Icarus TC4 | $750,000 |
| e | 6/27/05 | Icarus TC5 | $900,000 |
| f | 7/15/05 | Icarus TC6 | $17,500,000 |
| g | 8/1/05 | Icarus TC7 | $2,810,000 |
| h | 9/14/05 | Icarus TC8 | $650,000 |

|   | Dates of Transfer and Demand Note | Target Corporation | Transfer and Demand Note Amount |
|---|---|---|---|
| I | 9/27/05 | Icarus TC9 | $2,700,000 |
| j | 10/4/05 | Icarus TC10 | $1,500,000 |
| k | 10/13/05 | Icarus TC11 | $2,550,000 |
| l | 11/3/05 | Icarus TC12 | $13,800,000 |
| m | 11/14/05 | Icarus TC13 | $2,050,000 |
| n | 11/18/05 | Icarus TC14 | $550,000 |
| o | 11/18/05 | Icarus TC15 | $9,070,000 |
| p | 11/18/05 | Icarus TC16 | $3,200,000 |
| q | 11/23/05 | Icarus TC17 | $9,300,000 |
| r | 11/23/05 | Icarus TC18 | $1,870,000 |
| s | 12/5/05 | Icarus TC19 | $15,480,000 |

145.    On or about the following dates, defendants SAMYAK VEERA and

JOHN IVSAN, along with A.A., caused Icarus to purchase the stock of the target corporations

from MidCoast Financial's subsidiaries by having Icarus (i) assume the sham demand notes in

the following amounts and (ii) make the following cash payments:

|   | Date of Assumption | Target Corporation | Amount Assumed | Approximate Cash Paid |
|---|---|---|---|---|
| a | 6/17/05 | Icarus TC1 | $26,000,000 | - |
| b | 6/17/05 | Icarus TC2 | $2,150,000 | - |
| c | 6/17/05 | Icarus TC3 | $37,850,000 | - |
| d | 8/9/05 | Icarus TC4 | $750,000 | $50,000 |
| e | 8/9/05 | Icarus TC5 | $900,000 | $50,000 |
| f | 8/9/05 | Icarus TC6 | $17,500,000 | $200,000 |
| g | 8/9/05 | Icarus TC7 | $2,810,000 | - |

|   | Date of Assumption | Target Corporation | Amount Assumed | Approximate Cash Paid |
|---|---|---|---|---|
| h | 9/16/05 | Icarus TC8 | $650,000 | - |
| i | 10/12/05 | Icarus TC9 | $2,700,000 | - |
| j | 10/12/05 | Icarus TC10 | $1,500,000 | - |
| k | 10/21/05 | Icarus TC11 | $2,550,000 | - |
| l | 11/23/05 | Icarus TC12 | $13,800,000 | - |
| m | 11/23/05 | Icarus TC13 | $2,050,000 | - |
| n | 11/23/05 | Icarus TC14 | $550,000 | - |
| o | 11/23/05 | Icarus TC15 | $9,070,000 | - |
| p | 11/23/05 | Icarus TC16 | $3,200,000 | - |
| q | 11/23/05 | Icarus TC17 | $9,300,000 | - |
| r | 11/23/05 | Icarus TC18 | $1,870,000 | - |
| s | 12/8/05 | Icarus TC19 | $15,480,000 | - |

146.    On or about the following dates, defendant SAMYAK VEERA, A.A., and their co-conspirators caused Icarus to contribute currency trades purchased from Euram, with the claimed basis set forth below, to the following Icarus target corporations:

|   | Transfer Date | Target Corporation | Claimed Basis |
|---|---|---|---|
| a | 6/23/05 | Icarus TC1 | $32,548,795 |
| b | 6/23/05 | Icarus TC2 | $2,454,750 |
| c | 8/24/05 | Icarus TC4 | $1,502,750 |
| d | 8/24/05 and 11/30/05 | Icarus TC6 | $18,712,596 |
| e | 9/21/05 | Icarus TC8 | $1,701,030 |
| f | 10/24/05 | Icarus TC20 | $15,166,185 |
| g | 10/24/05 | Icarus TC10 | $1,552,085 |
| h | 11/30/05 | Icarus TC14 | $1,700,896 |

|   | Transfer Date | Target Corporation | Claimed Basis |
|---|---|---|---|
| i | 11/30/05 | Icarus TC12 | $17,155,437 |
| j | 11/30/05 | Icarus TC17 | $6,805,750 |
| k | 11/30/05 | Icarus TC15 | $8,149,263 |
| l | 11/30/05 | Icarus TC3 | $21,608,031 |
| m | 11/30/05 | Icarus TC21 | $36,415,508 |
| n | 11/30/05 | Icarus TC22 | $13,303,199 |
| o | 11/30/05 | Icarus TC7 | $21,628,128 |
| p | 11/30/05 | Icarus TC13 | $4,402,732 |
| q | 11/30/05 | Icarus TC16 | $4,493,910 |
| r | 11/30/05 and 12/5/05 | Icarus TC11 | $1,801,130 |
| s | 11/30/05 and 12/5/05 | Icarus TC5 | $2,053,278 |
| t | 11/30/05 and 12/5/05 | Icarus TC18 | $5,743,043 |
| u | 11/30/05 and 12/5/05 | Icarus TC9 | $2,901,778 |
| v | 12/16/05 | Icarus TC19 | $10,806,194 |

147.    On or about the following dates, defendants SAMYAK VEERA, A.A., and their co-conspirators caused the following Icarus target corporations to close out their currency trades with Euram for the following amounts (far below their claimed basis) to generate the following fraudulent losses:

|   | Transfer Date | Target Corporation | Close-out Amount | Fraudulent Losses Generated |
|---|---|---|---|---|
| a | 6/24/05 | Icarus TC1 | $4,327 | $32,544,468 |
| b | 6/24/05 | Icarus TC2 | $662 | $2,454,088 |
| c | 8/26/06 | Icarus TC4 | $830 | $1,501,920 |
| d | 9/26/05 | Icarus TC8 | $475 | $1,700,555 |

48

| | Transfer Date | Target Corporation | Close-out Amount | Fraudulent Losses Generated |
|---|---|---|---|---|
| e | 10/26/05 | Icarus TC10 | $398 | $1,551,687 |
| f | 10/27/05 | Icarus TC20 | $4,492 | $15,161,693 |
| g | 12/9/05 | Icarus TC3 | $11,061 | $21,596,970 |
| h | 12/9/05 | Icarus TC5 | $1,836 | $2,051,442 |
| I | 12/9/05 | Icarus TC13 | $244 | $4,402,488 |
| j | 12/9/05 | Icarus TC16 | $3,314 | $4,490,596 |
| k | 12/12/05 | Icarus TC14 | $91 | $1,700,805 |
| l | 12/12/05 | Icarus TC21 | $12,761 | $36,402,747 |
| m | 12/12/05 | Icarus TC9 | $936 | $2,900,842 |
| n | 12/14/05 | Icarus TC11 | $855 | $1,800,260 |
| o | 12/14/05 | Icarus TC15 | $2,740 | $8,146,523 |
| p | 12/14/05 | Icarus TC22 | $10,625 | $13,292,574 |
| q | 12/15/05 | Icarus TC7 | $3,551 | $21,624,577 |
| r | 12/16/05 | Icarus TC12 | $11,085 | $17,144,352 |
| s | 12/16/05 | Icarus TC17 | $476 | $6,805,274 |
| t | 12/16/05 | Icarus TC18 | $4,374 | $5,738,669 |
| u | 12/16/05 | Icarus TC6 | $2,799 | $18,709,527 |
| v | 12/22/05 | Icarus TC19 | $1,193 | $10,805,001 |

148.    On or about May 11, 2005, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused Santalum to be formed in Nevis.

149.    On or about May 18, 2005, defendants SAMYAK VEERA and JOHN IVSAN caused MidCoast Financial to distribute to its current and potential business contacts a false and misleading letter regarding its business and operations.

49

150.    On or about July 11, 2005, the conspirators caused CSB to open an offshore account for Santalum.

151.    In or about August 2005, defendants SAMYAK VEERA and JOHN IVSAN, and their co-conspirators caused MidCoast Financial to make a false and misleading submission to the IRS regarding the nature of MidCoast Financial's business.

152.    On or about August 25, 2005, defendant JOHN IVSAN assisted a relative of and nominee for defendant SAMYAK VEERA in opening a bank account in the name of the Aleph at CSB.

153.    On or about the following dates, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused the following Amalfi and Icarus target corporations to transfer the following funds from their U.S. bank accounts to the Santalum account at CSB:

|   | Transfer Date | Target Corporation | Wire Amount |
|---|---|---|---|
| a | 8/1/05 | Icarus TC5 | $240,000 |
| b | 8/11/05 | Amalfi TC10 | $410,000 |
| c | 8/16/05 | Icarus TC3 | $255,000 |
| d | 8/16/05 | Icarus TC2 | $105,000 |
| e | 8/16/05 | Icarus TC1 | $250,000 |
| f | 8/16/05 | Amalfi TC5 | $105,000 |
| g | 8/16/05 | Amalfi TC6 | $410,000 |
| h | 8/17/05 | Icarus TC6 | $3,180,000 |
| I | 8/17/05 | Icarus TC4 | $250,000 |
| j | 8/17/05 | Icarus TC7 | $2,090,000 |
| k | 10/18/05 | Icarus TC1 | $315,000 |

|   | Transfer Date | Target Corporation | Wire Amount |
|---|---|---|---|
| l | 10/18/05 | Amalfi TC6 | $100,000 |
| m | 10/19/05 | Icarus TC21 | $2,385,000 |
| n | 10/21/05 | Icarus TC22 | $290,000 |
| o | 12/16/05 | Icarus TC12 | $3,025,000 |

154.    On or about the following dates, defendants SAMYAK VEERA and JOHN IVSAN and their co-conspirators caused the following Icarus target corporations to file fraudulent federal corporate income tax returns, Forms 1120, for the following tax years, falsely claiming fraudulent losses in the following amounts:

|   | Approximate Filing Date | Target Corporation | Tax Year Ended | Approximate Total Amount of Fraudulent Losses Reported |
|---|---|---|---|---|
| a | 1/25/06 | Icarus TC20 | 10/31/05 | $1,700,805 |
| b | 1/25/06 | Icarus TC1 | 6/30/05 | $13,292,574 |
| c | 1/25/06 | Icarus TC4 | 8/31/05 | $17,144,352 |
| d | 1/25/06 | Icarus TC10 | 10/31/05 | $6,805,274 |
| e | 3/21/06 | Icarus TC17 | 12/31/05 | $1,501,920 |
| f | 3/21/06 | Icarus TC5 | 12/31/05 | $4,402,488 |
| g | 6/21/06 | Icarus TC8 | 9/30/05 | $1,551,687 |
| h | 9/15/06 | Icarus TC14 | 12/31/05 | $2,454,088 |
| i | 9/15/06 | Icarus TC2 | 12/31/05 | $2,051,442 |
| j | 9/15/06 | Icarus TC6 | 12/31/05 | $21,624,577 |
| k | 9/15/06 | Icarus TC16 | 12/31/05 | $10,805,001 |
| l | 9/20/06 | Icarus TC19 | 12/31/05 | $4,490,596 |
| m | 9/21/06 | Icarus TC3 | 12/31/05 | $21,596,970 |
| n | 9/25/06 | Icarus TC18 | 12/31/05 | $36,402,747 |

| | Approximate Filing Date | Target Corporation | Tax Year Ended | Approximate Total Amount of Fraudulent Losses Reported |
|---|---|---|---|---|
| o | 9/25/06 | Icarus TC21 | 12/31/05 | $2,900,842 |
| p | 9/25/06 | Icarus TC13 | 12/31/05 | $18,709,527 |
| q | 10/20/06 | Icarus TC12 | 1/31/06 | $32,544,468 |
| r | 10/26/06 | Icarus TC22 | 12/31/05 | $1,800,260 |
| s | 10/26/06 | Icarus TC7 | 12/31/05 | $5,738,669 |
| t | 12/20/06 | Icarus TC9 | 3/31/06 | $8,146,523 |
| u | 2/20/07 | Icarus TC15 | 5/31/06 | $15,161,693 |
| v | 3/28/07 | Icarus TC11 | 6/30/06 | $1,700,555 |

155.    In or about March 2006, defendant SAMYAK VEERA, A.A., and their co-conspirators caused a law firm to prepare a series of false, misleading, and fraudulent legal opinion letters regarding the transactions involving Icarus and the 22 Icarus target corporations.

156.    In or about May 2006, defendants SAMYAK VEERA and JOHN IVSAN, A.A., and their co-conspirators met in Las Vegas, Nevada.

157.    On or about August 22, 2007, at the direction of defendant SAMYAK VEERA and based in part on the false and misleading legal opinion letter prepared by defendant JOHN IVSAN, A.A. provided misleading, incomplete, and false answers and information to the IRS during a sworn interview in Philadelphia, Pennsylvania.

In violation of Title 18, United States Code, Section 371.

## COUNT TWO
**(Corruptly Endeavoring To Obstruct and Impede
the Due Administration of the Internal Revenue Laws)**

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 89 and 93 through 157 of Count One are incorporated here.

2.      From in or about June 2003 and through at least in or about 2007, in the Eastern District of Pennsylvania and elsewhere, defendants

**SAMYAK VEERA and
JOHN IVSAN**

corruptly endeavored to obstruct and impede the due administration of the Internal Revenue laws by, among other things, committing and causing to be committed the acts described in paragraphs 104 through 157 of Count One above.

In violation of Title 26, United States Code, Section 7212(a).

## COUNTS THREE THROUGH THIRTEEN
### (Tax Evasion)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 89 and 93 through 157 of Count One are incorporated here.

2.      From in or about June 2003 and through in or about August 2007, in the Eastern District of Pennsylvania and elsewhere, defendants

### SAMYAK VEERA and
### JOHN IVSAN

willfully attempted to evade and defeat a substantial part of the income tax due and owing by the target corporations listed below to the United States of America for years set forth below by various means, including among others:

> a.      designing, marketing, implementing, and defending the fraudulent transactions that the defendants knew lacked economic substance and a genuine business purpose;

> b.      using these fraudulent transactions to generate millions of dollars in tax losses that the defendants knew could not properly be claimed on the returns for the target corporations;

> c.      forming and using nominee entities, such as Amalfi and Icarus and certain purported charitable trusts, that served no legitimate business purpose, but were used merely to evade the target corporations' income taxes and to hide the conspirators' proceeds;

54

d.    creating and causing to be created false and fraudulent legal opinion letters and representation letters;

e.    causing to be prepared, signed, and filed with the IRS false and fraudulent U.S. Corporate Income Tax Returns, Forms 1120, and Corporate Applications for Tentative Refund, Forms 1139, for the years set forth below, which overstated the target corporations' capital and ordinary losses and understated their taxable income and tax due and owing, and which were used to evade the target corporations' income taxes;

f.    causing fraudulent tax refunds to be deposited in accounts controlled by the defendants through their nominee, A.A.; and

g.    taking various steps to conceal from the IRS the true nature of the fraudulent transactions and certain conspirators' role in designing, marketing, implementing, and defending the transactions, including but not limited to, causing the creation and execution of false, misleading, and fraudulent documents and causing A.A. to provide false and misleading testimony and information to the IRS.

| Count | Target Corporation | Tax Return | Approximate Filing Date of Return | Approximate Total Amount of Fraudulent Losses Reported |
|-------|-------------------|------------|-----------------------------------|--------------------------------------------------------|
| 3 | Amalfi TC8 | 2005 Form 1120 | 9/25/06 | $5,361,137 |
| 4 | Amalfi TC8 | 2003 and 2004 Form 1139 | 11/6/06 | $1,346,756 |
| 5 | Amalfi TC5 | 9/30/05 Form 1120 | 6/22/06 | $3,686,042 |
| 6 | Amalfi TC3 | 2005 Form 1120 | 9/21/06 | $18,851,813 |
| 7 | Amalfi TC3 | 2003 and 2004 Form 1139 | 10/30/06 | $545,685 |
| 8 | Amalfi TC6 | 9/30/05 Form 1120 | 6/22/06 | $3,127,551 |
| 9 | Icarus TC3 | 2005 Form 1120 | 9/21/06 | $21,596,970 |
| 10 | Icarus TC3 | 2003 and 2004 Form 1139 | 10/30/06 | $2,506,968 |
| 11 | Icarus TC1 | 6/30/05 Form 1120 | 1/26/06 | $32,544,468 |
| 12 | Icarus TC1 | 6/30/03 and 6/30/04 Form 1139 | 3/29/06 | $2,530,122 |
| 13 | Icarus TC7 | 2005 Form 1120 | 10/26/06 | $21,624,577 |

All in violation of Title 26, United States Code, Section 7201 and Title 18, United States Code, Section 2.

## COUNTS FOURTEEN THROUGH THIRTY-TWO
### (Wire Fraud)

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      Paragraphs 1 through 89 and 93 through 157 of Count One are incorporated here.

2.      From in or about June 2003 and through at least in or about 2007, in the Eastern District of Pennsylvania and elsewhere, defendants

### SAMYAK VEERA and
### JOHN IVSAN

and others known and unknown to the Grand Jury, devised and intended to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, that is, a scheme to defraud the IRS through the design, marketing, implementation, and defense of the fraudulent tax transactions (described above in paragraphs 18 through 89 and paragraphs 93 through 103), and for the purpose of executing such scheme and artifice and attempting to do so, caused to be transmitted by means of wire communication in interstate and foreign commerce the writings, signs, signals, and sounds described below for each count, each transmission constituting a separate count:

| Count | Approximate Date | Approximate Wire Transfer Amount | Sender | Recipient Bank Account at CSB |
|---|---|---|---|---|
| 14 | 6/20/05 | $445,000 | Amalfi TC7 | Delta Trading |
| 15 | 6/21/05 | $645,000 | Amalfi TC3 | Delta Trading |
| 16 | 6/21/05 | $1,340,000 | Amalfi TC8 | Delta Trading |
| 17 | 6/22/05 | $745,000 | Amalfi TC11 | Delta Trading |
| 18 | 8/1/05 | $240,000 | Icarus TC5 | Santalum |
| 19 | 8/11/05 | $410,000 | Amalfi TC10 | Santalum |
| 20 | 8/16/05 | $105,000 | Amalfi TC5 | Santalum |
| 21 | 8/16/05 | $410,000 | Amalfi TC6 | Santalum |
| 22 | 8/16/05 | $255,000 | Icarus TC3 | Santalum |
| 23 | 8/16/05 | $105,000 | Icarus TC2 | Santalum |
| 24 | 8/16/05 | $250,000 | Icarus TC1 | Santalum |
| 25 | 8/17/05 | $3,180,000 | Icarus TC6 | Santalum |
| 26 | 8/17/05 | $250,000 | Icarus TC4 | Santalum |
| 27 | 8/17/05 | $2,090,000 | Icarus TC7 | Santalum |
| 28 | 10/18/05 | $100,000 | Amalfi TC6 | Santalum |
| 29 | 10/18/05 | $315,000 | Icarus TC1 | Santalum |
| 30 | 10/19/05 | $2,385,000 | Icarus TC21 | Santalum |
| 31 | 10/21/05 | $290,000 | Icarus TC20 | Santalum |
| 32 | 12/16/05 | $3,025,000 | Icarus TC12 | Santalum |

All in violation of Title 18, United States Code, Sections 1343, 1349, and 2.

## NOTICE OF FORFEITURE

**THE GRAND JURY FURTHER CHARGES THAT:**

1.      As a result of the violations of Title 18, United States Code, Section 371 and Title 18, United States Code, Section 1343 set forth in this indictment, defendants

**SAMYAK VEERA and
JOHN IVSAN**

shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such offense, including, but not limited to, the sum of $150,000,000.

2.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant:

        (a)      cannot be located upon the exercise of due diligence;

        (b)      has been transferred or sold to, or deposited with, a third party;

        (c)      has been placed beyond the jurisdiction of the Court;

        (d)      has been substantially diminished in value; or

        (e)      has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendants up to the value of the property subject to forfeiture.

All pursuant to Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 981(a)(1)(c).

**A TRUE BILL:**

_____
**GRAND JURY FOREPERSON**

_____
**ZANE DAVID MEMEGER**
**UNITED STATES ATTORNEY**